**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael B. KARMAN,**
**Defendant–Appellant.**

No. 87–1769.

United States Court of Appeals,
Fifth Circuit.

July 1, 1988.

Rehearing and Rehearing En Banc
Denied Aug. 24, 1988.

Charles Louis Roberts, Robert Ramos, El Paso, Tex., for defendant-appellant.

LeRoy M. Jahn, Janet E. Bauerle, Asst. U.S. Attys., Helen M. Eversberg, U.S. Atty., San Antonio, for plaintiff-appellee.

Before BROWN, KING and HIGGINBOTHAM, Circuit Judges.

KING, Circuit Judge:

Michael B. Karman entered a conditional guilty plea to both counts of an indictment charging, in Count One, that he unlawfully possessed marijuana with the intent to distribute and, in Count Two, that he traveled in interstate commerce to facilitate an unlawful activity involving controlled substances. On appeal, Karman challenges the district court's denial of his motion to suppress evidence. While we find no merit in Karman's arguments with respect to the evidence found in his suitcase, we must vacate the judgment of conviction and sentence on Count One and remand the balance of his suppression motion to the district court for further findings of fact and conclusions of law with respect to whether the district court should have suppressed two marijuana cigarettes and certain statements made by Karman. In addition, the government concedes that Karman's conviction on Count Two should be vacated. Therefore, we reverse the judgment of conviction and vacate the sentence imposed on that count.

I.

On February 23, 1987, United States Border Patrol agent Bradley Williams ("Williams") was assigned to duty at the El Paso International Airport.[1] At approximately 6:45 a.m., Williams observed a person later identified as Michael B. Karman ("Karman") get out of a Holiday Inn courtesy van. With the assistance of the van driver, Karman unloaded three suitcases and a smaller bag and moved them into the airport terminal and to the American Airlines ticket counter. The three suitcases appeared to be brand new, with no visible scuffmarks or dirt on them. Karman appeared to be nervous and in a hurry. After tipping the driver, Karman checked in the three suitcases. At this point, Karman seemed to relax; without hurrying anymore, he casually walked towards the main lobby and went into the airport cafeteria. Karman neither sat down nor ordered anything. After a minute or two, he turned around and exited the cafeteria.

Williams thought that Karman's behavior was suspicious and decided to look at Karman's suitcases. Williams and his partner proceeded to the American Airlines baggage-holding area. Since all three of the checked suitcases were soft-sided, Williams was able to compress the sides of the bags to feel the contents. Upon compressing the suitcases, Williams was able to feel a solid mass in each one. Williams also smelled a very strong odor of cologne or after-shave lotion emanating from the seams of each case. Suspecting that the suitcases contained narcotics, Williams decided to take them to the Border Patrol office at the airport. Several other agents went to intercept Karman and talk with him.

Border Patrol agents John Thomas Moore ("Moore") and Jose Gomez ("Gomez") followed Karman and spoke to him just before he reached his departure gate.

---

1. In reviewing a district court's ruling on a motion to suppress based on testimony at a suppression hearing, we must accept the district court's factual findings unless they are clearly erroneous or are influenced by an incorrect view of the law. *United States v. Maldonado,* 735 F.2d 809, 814 (5th Cir.1984). Further, we must view the evidence in the light most favorable to the party that prevailed below. *Id.* Therefore, this opinion will reflect, in large measure, the factual findings of the district court below. Those findings are supported by the testimony at the suppression hearing and are, for the most part, undisputed.

The agents identified themselves as immigration officers and asked Karman if he had any luggage, other than the small shoulder bag he was carrying with him at the time. Karman replied that he did not. When Gomez asked him whether he had checked any suitcases, Karman said no. Gomez then asked Karman if he had any baggage claim tickets. Karman did not answer, he merely started to hand his ticket to the agent. Karman was nervous and his hand was shaking as he handed over the ticket. No baggage claim checks were attached to the ticket envelope. The agents then asked Karman to accompany them to the Border Patrol office to answer some more questions about his luggage. Karman agreed to accompany the officers.

At the office, Moore read Karman *Miranda* rights from a printed form. Karman also read the form, stated that he understood it, and signed it. Moore decided to give Karman "a pat-down search just for security reasons." Before the pat-down, Karman asked if he might have a cigarette. Moore responded that he could,

took Karman's cigarette pack which was in Karman's pocket, and dumped it out to reveal two hand-rolled cigarettes which Moore believed to be marijuana. After confirming that suspicion by looking at and smelling the hand-rolled cigarettes, Moore placed Karman under arrest.

Other agents then brought the suitcases down from "wherever they were holding them." Karman's identification bore a different name than that which was on the ticket and suitcases. Karman was then confronted with the three suitcases Williams had removed from the baggage area. Karman gave Supervisor Border Patrol agent Francisco Chavaria ("Chavaria") a rather lengthy explanation of the circumstances surrounding his arrival in El Paso.[2] When asked whether the bags were his, Karman replied in the negative. He did, however, state that he had seen the bags before. Karman was also asked whether he would consent to a search of the bags; he replied that he had no objection to their search because the suitcases were not his property. Since Karman did not have the

2. Chavaria gave the following testimony on direct examination:
Q. Tell the Court what you talked with the Defendant about.
A. I asked Mr. Karman how he happened to be in El Paso. And he related to me a rather lengthy story about the circumstances which had brought him to the City. He told me that the previous Thursday, I believe it was a Monday when we were talking to him, that he had received a phone call at his house. And an individual, which he did not know, had told him that he was to come to El Paso and pick up some suitcases and return to Chicago.
He told me that he had received written instructions which were deposited in his mailbox. And the morning prior to his trip to El Paso, he found two suitcases at his front door, which he brought to El Paso on his trip. Upon arriving in El Paso, he called the Holiday Inn Airport Shuttle to pick him up and take him to the motel.
When he arrived at the motel, a Hispanic male was waiting for him there. When he exited the shuttle, the male gave him a motel room key and simply said, "This is your key." And he didn't see him again. He further told me that he went up to the motel room, and upon entering ther [sic], the suitcases in question were in the room waiting for him.
Q. The three suitcases that were ultimately seized?
A. The three suitcases. He told me that after arriving, he left his room and walked across

Interstate 10 to go have some dinner. He came back to his room and waited overnight until the next morning when he took the Holiday Inn van to go back to the airport.
When he left the room, he left the two brown suitcases which he had brought with him from Chicago and the room key on the dresser. When I asked him what was in the suitcases, he told me that he did not know, but that he thought it was something that wasn't supposed to be there. He also told me—
Q. This is referring to the three suitcases that he was taking out?
A. Yes. When I asked him about money, he said that he had received $500 in an envelope, and also that he had paid for airline tickets from Chicago and El Paso and return out of that $500. That he was to receive $300 more upon his return to Chicago. He also told me that he was a former cocaine addict. That he had a girl friend in Chicago who was also a cocaine addict, and he didn't want her to get in trouble. And that the person that contacted him on the telephone told him that he better do it.
Q. Would he ever identify who this person was?
A. Pardon me?
Q. Did he ever identify who this person was that had contacted him on the telephone?
A. No, he told me that he had no idea who it was that had called him.

keys to the cases, the agents had to use bolt cutters to cut off the locks. Inside all three suitcases, the agents found a total of seventy-two pounds of roughly-packed marijuana bundled in plastic trash bags, heavily doused in cologne.

On March 17, 1987, a federal grand jury returned a two count indictment charging Karman with several violations of federal narcotics law. Count One charged that Karman "unlawfully, knowingly, and intentionally did possess with intent to distribute a quantity of marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1)." Count Two charged Karman with using a facility in interstate commerce to carry on an unlawful activity involving controlled substance offenses, in violation of the Travel Act, Title 18, United States Code, section 1952. On May 13, Karman filed a motion to suppress all the evidence obtained from him at the airport. The district court denied the motion on July 21. As a result of the district court's ruling, Karman entered a conditional plea of guilty to both counts of the indictment, see Fed.R. Crim.P. 11(a)(2), reserving the right to appeal the district court's ruling on his motion to suppress. The district court sentenced Karman to a three year term of imprisonment on Count One to be followed by a three year special parole term. In addition, Karman received a three year term of imprisonment on Count Two to be served concurrently with that imposed on Count One. Karman was only required to serve six months of his sentence with the balance of the term of imprisonment suspended and Karman placed on five years probation. Karman was also ordered, pursuant to Title 18, United States Code, section 3013(a), to pay a $50 assessment on

each count, for a total of $100. Karman filed timely notice of appeal.

## II.

On appeal, Karman argues first that the agents' compression and sniff of his bags constituted an illegal seizure or search since the agents did not have probable cause to believe Karman's bags contained contraband. "We have recently held, however, that a Border Patrol agent's removal of a suspect's bag from an airport baggage area conveyor belt, his squeeze of the bag to procure a scent, and his subsequent sniff of that bag constituted neither a seizure nor a search." *United States v. Garcia,* 849 F.2d 917, 919 (1988) (citing *United States v. Lovell,* 849 F.2d 910, 913 (1988)). *Lovell* and *Garcia* dispose of Karman's argument.

Karman also argues, however cryptically, that the district court erred in finding that Karman, having abandoned the suitcases, lacked standing to challenge the agents' later opening and search of the bags. When first approached by the agents, Karman informed them that he had no luggage other than the small shoulder bag he was carrying with him at the time. He also denied checking any luggage. There were no baggage claim checks stapled to the ticket envelope he showed the agents. After agreeing to accompany the agents to the Border Patrol office, Karman repeatedly denied ownership of the suitcases. Finally, the suitcases' identification tags bore a different name than that on Karman's identification. Under the circumstances, we can find no clear error in the district court's finding that Karman abandoned the suitcases.[3]

---

**3.** We note that Karman's abandonment was in no way the product of any improper police conduct. *See, e.g., United States v. Beck,* 602 F.2d 726, 728 (5th Cir.1979). We have held that the agents' actions leading up to their contact with Karman—squeezing and sniffing the suitcases—were not unlawful. *See Garcia,* at 919; *Lovell,* at 913. Moreover, when Karman abandoned his suitcases, the agents were engaged simply in asking him questions in a public

place, perfectly permissible under the fourth amendment. *See United States v. Gonzales,* 842 F.2d 748, 752 (5th Cir.1988); *United States v. Hanson,* 801 F.2d 757, 761 (5th Cir.1986) (fourth amendment seizure did not take place where the officers merely approached the defendant, displayed their badges, and asked questions); *United States v. Berry,* 670 F.2d 583, 603 (5th Cir. 1982) (en banc) (where officers approached suspect, asked to speak with him, and requested identification, the fourth amendment was not implicated).

Karman also argues, in a cursory fashion, that the district court should have suppressed the two marijuana cigarettes and Karman's statements to Chavaria. Karman fails to provide either argument or support for these contentions and the government has completely ignored them. Moreover, the district court neglected to address them in its decision. As Karman raised these issues below[4] and at least mentions them on appeal, we are unable to conclude that Karman has either waived or abandoned them. Therefore, because the proper resolution of Karman's request to suppress the marijuana cigarettes and his statements to Chavaria requires further consideration by the district court, we must vacate Karman's conviction and sentence on Count One and remand to the district court for findings of fact and conclusions of law with respect to Karman's two unresolved contentions.

Finally, while Karman does not raise the argument on appeal, the government concedes that under our recent decision in *United States v. Hernandez-Palacios*, 838 F.2d 1346 (5th Cir.1988), Karman's conviction on Count Two for violating the Travel Act must be vacated. Therefore, we reverse the judgment of conviction and vacate the sentence imposed on Count Two.

### III.

For the foregoing reasons, the judgment of conviction and sentence on Count One is VACATED and the case is REMANDED to the district court for further findings of fact and conclusions of law; and the judgment of conviction on Count Two is REVERSED and the related sentence is VACATED.

---

Therefore, Karman's abandonment of his suitcases was not tainted by any fourth amendment violations on the part of the agents; that abandonment occurred well before Karman was either "seized" or placed under arrest by the agents.

4. In his motion to suppress, Karman asked the district court "to [s]uppress all items of evidence illegally obtained from him by law enforcement agents following the illegal seizure of both Defendant KARMAN and of his luggage at the El Paso International Airport...." In his supporting brief, however, Karman appeared to narrow the suppression inquiry to the marijuana discovered in the search of his suitcases. Karman argued that he was illegally seized and that, therefore, the fourth amendment "require[d] suppression of the evidence discovered as the result of a subsequent *search of his luggage.*"

Moreover, Karman concluded by suggesting that "the seizure of *the evidence from the luggage* of Defendant KARMAN was unlawful and must be suppressed." Nevertheless, Karman's attorney clarified the scope of the suppression motion during the hearing on that motion:

THE COURT: What would you like to say in support of your motion? Well, let me ask you this first, a different form of that question. What exactly are you trying to suppress in this case?

MR. RAMOS: The two marijuana cigarettes, the contents of the suitcases, that is, the approximately 90 pounds of marijuana, and the statements that he gave concerning his purpose in coming to El Paso and what he did.

THE COURT: Two marijuana cigarettes, all the statements and what's in the suitcases?

MR. RAMOS: Yes, sir.