**UNITED STATES of America**

v.

**Doreen Angela WRIGHT.**

**Cr. No. 4–87–195–E.**

United States District Court,
N.D. Texas,
Fort Worth Division.

Feb. 10, 1989.

Fred Schattman, Fort Worth, Tex., for U.S.

Brantley Pringle, Noah Lipman, Fort Worth, Tex., for Wright.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

This is another drug courier case. Defendant Doreen Wright was arrested during an airport stop. She seeks to suppress

cocaine discovered by a law enforcement officer while searching her suitcase.

A suppression hearing was held on March 25, 1988, and the usual panoply of issues arose—whether Wright was seized within the context of the Fourth Amendment, whether the seizure, if any, was supported by reasonable suspicion, whether Wright's subsequent consent to the search of her suitcase was voluntary. These standard questions must once again be addressed.

In this case, however, haphazard police work has created a few additional and, of course, novel issues. Namely, whether the warrantless seizure of Wright's suitcase from a locked storage facility by a law enforcement officer, who professed to be conducting, at least in part, a routine inventory of Wright's property in connection with her arrest, was an infraction which (1) invokes Fourth Amendment analysis, (2) taints Wright's subsequent consent, if any, to the search of her luggage, and (3) requires the application of the exclusionary rule to suppress narcotics discovered in her suitcase.

After a recitation of the Court's fact findings, the pertinent issues will be discussed in turn.

## FINDINGS OF FACT

Officer Randall Johnson, an Irving, Texas, Police Officer, is assigned to the Drug Enforcement Agency ("DEA") Task Force at Dallas–Fort Worth International Airport ("DFW"). On December 7, 1987, Officer Johnson met American Airlines Flight 295 arriving at DFW from New York City. He was accompanied by Special Agents Richard Jones and J.W. Hewitt, also members of the DEA Task Force. Agents Jones and Hewitt are employed by the Immigration and Naturalization Service ("Immigration Services"). These officers routinely meet Flight 295. It arrives from a known "target" city for cocaine.[1]

On December 7, 1987, at approximately 10:10 a.m., the Officers once again met Flight 295. They observed the passengers disembarking the aircraft. Although the Officers had received no prior information regarding Defendant Wright, their attention became focused upon her as she exited the plane. Wright appeared nervous and watchful. Officer Johnson testified that Wright walked slower than the normal passenger and continuously looked over her shoulder. She bypassed the first exit to the luggage area and proceeded down the concourse to the second exit. Their suspicions aroused, the Officers followed.

Wright left the concourse area and took the second exit into the baggage claim area. She waited there a few minutes, in fact, she even approached Agent Jones, asking him if the area in which they stood was the place where the luggage from Flight 295 would be returned. He stated that it was. Jones noticed that Wright spoke with a West Indian accent, and a short time later, he advised Officer Johnson of Wright's accent. Wright moved about 15 feet away from Jones and continued to wait for the luggage from Flight 295 to be returned.

Wright went to a pay phone and made a local call. She spoke on the phone briefly. She returned to the baggage carousel where she and other passengers waited for the return of their luggage. She continued to wait until all the baggage on the carousel except one suitcase—a large, grey, soft-sided suitcase—had been retrieved. Wright stood there, alone, watching the suitcase circle on the rotating carousel. She made no attempt to claim it.

At this point, two black male suspects entered the baggage claim area, and according to Officer Johnson, "made eye contact" with Wright. The suspects and Wright did not speak with one another.

---

**1.** Dallas/Fort Worth, Detroit, Atlanta, San Diego, Los Angeles, New York, and San Juan have received the dubious distinction of being classified by various courts as "transshipment," "crossroads" or "hub" cities, that is, cities where couriers travel, pass through, or meet connecting flights to use cities. The places in which narcotics are sold are referred to "use cities." *See* Becton, *The Drug Courier Profile: "All Seems Infected that th' Infected Spy, as All Looks Yellow to the Jaundic'd Eye,* 65 N.C.L.Rev. 417, 440 n. 137 (1987).

The suspects sat down and waited about the baggage claim area.

A skycap approached Wright and asked her if she was waiting for luggage. They spoke briefly, and Wright was directed to an American Airlines employee in charge of unclaimed luggage who was standing nearby. The American Airlines employee and Wright moved a few feet away to a stand-up desk where Wright completed a baggage claim form. The grey, soft-sided suitcase which had remained unclaimed on the baggage carousel was removed by airline personnel and placed in a locked storage area.

One of the two black male suspects left the baggage claim area and stood outside the terminal. Agent Hewitt followed him. The other suspect remained in the baggage claim area, but moved to a seat closer to where the porter and Wright were standing. He remained there, briefly, and then again moved to another seat closer to Wright and the porter. He sat down on the baggage carousel near the area where they were standing. As Wright moved away from the stand-up desk, she walked past the suspect. He stood up and walked with her out of the baggage claim area toward the terminal exit.

Officer Johnson approached Wright and the black male suspect. Johnson identified himself as a police officer, displayed his credentials, and asked to speak with them. Wright agreed, but the suspect disclaimed knowing Wright and asked why Johnson wanted to speak with him. Johnson stated that he simply desired to speak with the couple a few minutes, but the male suspect refused, walked away, and exited the airport terminal. Wright did not leave with the suspect. She remained in the area and continued to speak with Johnson.

Officer Johnson asked to see Wright's airline ticket. She handed it to him along with her ticket folder and baggage claim stub. Johnson reviewed the ticket, noting that it was a one-way cash ticket, purchased on the day it was issued, December 7, and that it bore the name "D. Harriot." Officer Johnson returned the ticket, the folder, and the baggage claim stub to Wright. He asked her if she could produce some form of personal identification. Wright complied with Johnson's request. She displayed a picture identification card bearing the name "Doreen Harriot" and handed it to Johnson. Johnson looked at the identification card and returned it to Wright.

Johnson, like Agent Jones, also took note of a distinct accent in Wright's speech, and he asked her where she was born. Wright stated "Jamaica." Johnson asked Wright if she would be in the Dallas area long, a question to which Wright replied "yes." Since Wright carried no luggage, Johnson's suspicions were heightened by this answer. Johnson asked Wright if she had any luggage. Wright said her luggage had not been transported on Flight 295, that is, the Flight on which she arrived. She stated that her luggage would be arriving on the next American Airlines' Flight from New York City.

At this point, Agent Jones, who had been standing nearby, approached Johnson and Wright. Agent Jones is a United States Immigration Officer and has been employed by the Immigration Service for 20 years. Jones has been assigned to the DEA Task Force at DFW for approximately one year. Jones identified himself to Wright as an Immigration Officer, displayed his credentials, and asked her which country she was a citizen of. Wright replied "Jamaica." Wright claimed to be a legal permanent resident of the United States. Jones asked Wright for proof of her alien registration. Wright could not produce the necessary documents. She explained that the documents had been lost. Jones asked her if she had filed a claim with Immigration Services to replace the documents. Wright stated that she had not. Jones placed her under arrest and explained if his subsequent investigation verified her resident alien status that she would be released. Jones' administrative detention of Wright was based solely upon her failure to carry a Resident Alien card.

Wright was transported to the airline terminal where Immigration Services has

its office.[2] Officer Johnson assisted Jones in processing the arrest of Wright for an alleged violation of the United States immigration laws. Jones then proceeded to obtain basic biographical information from her. Jones read the *Miranda* warnings to Wright. She indicated to Jones that she understood them.

At this time, the next incoming American Airlines Flight from New York City was not scheduled to arrive for at least another hour, or approximately, at 12:00 noon. Agent Jones asked Johnson if he would meet the Flight to locate and retrieve Wright's suitcase. Johnson agreed. As the Flight was not due to arrive for almost an hour, Johnson decided to wait in the Task Force Office.

Jones testified that it was the policy of Immigration Services to maintain control and custody of the property of an arrestee in his or her possession at the time of the arrest.[3] While Johnson ostensibly shared this concern for the safekeeping of Wright's property, he testified that he believed that the suitcase might also contain narcotics.

Agent Jones removed Wright's baggage claim stub from her ticket folder and gave it to Officer Johnson. Johnson took the stub with him to meet the incoming American Airlines Flight. He observed the luggage from the arriving Flight as it was dispensed onto the baggage carousel. All of the Flight's baggage was claimed by its passengers.

Johnson reasoned that Wright's luggage either arrived on the earlier Flight—Flight 295 and was unclaimed—or was still lost and would possibly be transported on the next arriving New York Flight. Johnson suspected that the grey, soft-sided suitcase, which he had noticed earlier among the baggage arriving on Flight 295 and which had remained unclaimed on the baggage

carousel, belonged to Wright. Now, more than two hours after Flight 295 had arrived, Johnson went to the storage area for unclaimed baggage to verify his suspicions.

The storage area was completely enclosed by a wire-mesh screen. Johnson looked into the storage area and saw what he believed to be the same grey, soft-sided suitcase that he had observed a few hours earlier, unclaimed, on the baggage carousel. Johnson located the American Airlines employee responsible for the baggage storage area and identified himself as a police officer. He requested that the employee allow him to enter the storage area and compare the number on Wright's baggage claim stub to that of the claim number on the grey, soft-sided suitcase. The American Airlines employee allowed Johnson to enter the storage area. Once inside, Johnson located the grey, soft-sided suitcase and matched the baggage claim stub number to that of the suitcase. Although Wright's permission to claim her suitcase had neither been sought nor obtained, Johnson removed it from the storage area and returned with it to the DEA Task Force Office.

Officer Johnson testified that at this time he read the *Miranda* warnings to Wright, and she again indicated that she understood them. He showed her the grey, soft-sided suitcase. Wright identified it as her own. Johnson requested permission to search the suitcase. The testimony of Agent Jones and Officer Johnson is conflicting whether Wright expressed any verbal consent to Johnson's request or merely shrugged her shoulders in response. Jones, who was present, cannot remember the manner in which Wright expressed or implied her consent. Officer Johnson testified that Wright verbally agreed to the search. While written consent forms were available, Johnson did not bother to use

---

2. The Defendant was arrested in airline terminal 3E. The offices of Immigration Services and the DEA Task Force are located in airline terminal 2W. Their offices are not separate; rather, the government agencies share the same office space in terminal 2W near United States Customs Office.

3. Agent Jones also admitted that in no event would the suitcase be transported with Wright to jail, if indeed she was to be sent at all, because a jail would not accept it. Instead, the suitcase would remain at the offices of Immigration Services until claimed by Wright upon her release.

them; Wright's consent was not obtained in writing. Wright denies consenting to the search. She also testified that Officer Johnson failed to give her *Miranda* warnings anytime before or prior to his request to search the suitcase.

Wright's suitcase was secured by a small padlock, and when asked, Wright stated that she did not have a key to open it. Although Wright had no key, Johnson was able to open the suitcase. Another DEA agent maintains a large inventory of spare suitcase keys. He was able to find one which unlocked the padlock.

Johnson opened the suitcase, searched through it, and observed a large round cylindrical package inside. The package was wrapped with masking tape. Without asking Wright's permission to unwrap the package, Johnson opened it and observed a white powdery substance he believed to be cocaine. Johnson then advised Wright that she was also under arrest for possession of cocaine with intent to distribute. A chemical field test was performed on the white powdery substance. The test was positive for the presence of cocaine.

### CONCLUSIONS OF LAW

A. Whether and When a Seizure Occurred

■ The first legal issue to be determined is whether the Officers' encounter with Wright anytime prior to her arrest constituted a "seizure" within the context of the Fourth Amendment. If an investigative seizure of Wright occurred prior to

4. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

5. *United States v. Berry*, 670 F.2d 583, 594 (5th Cir.1982) (en banc).

6. As a majority of the Justices differed on the analysis to be applied in the *Mendenhall* decision, the views expressed in the two plurality opinions do not constitute binding precedent. The Fifth Circuit Court of Appeals, however, in *United States v. Berry*, 670 F.2d 583, 595 (5th Cir.1982) (en banc), adopted Justice Stewart's definition of a "seizure."

7. *Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1877 (1980).

8. 460 U.S. 491, 502–503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229 (1983).

Justice White's plurality opinion stated that:

her arrest, the Government was required to establish that the seizure was "sufficiently limited in scope and duration." [4] A review of the facts and the application of controlling caselaw compels the Court to conclude that at no time prior to her arrest was there a constraint on Wright's personal liberty sufficient to require Fourth Amendment scrutiny.

It is well settled that not every contact between a police officer and a citizen implicates the Fourth Amendment. Where no element of detention is present, a citizen and a police officer may freely communicate and the interaction constitutes nothing more than mere communication. "[A]irport stops of individuals by police, if extremely restricted in scope and conducted in a completely non-coercive manner, do not invoke the Fourth Amendment." [5]

In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), Justice Stewart, in a plurality opinion joined only by Justice Rehnquist, set forth the test for determining whether a seizure has occurred within the perimeters of the Fourth Amendment.[6] Under *Mendenhall*, the salient issue to be determined is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." [7] Three years after *Mendenhall* was decided, seven Justices of the Supreme Court implicitly subscribed to the "free to leave" test in *Florida v. Royer*.[8] When the "free to leave" test is applied to the facts of this case, it becomes

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, [and] by asking if he is willing to answer some questions.... Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of justification.

*Royer*, 460 U.S. at 497, 103 S.Ct. at 1324. In his dissent, Justice Rehnquist stated: "I agree with the plurality's intimation that when the detectives first approached and questioned Royer, no seizure occurred and thus the constitutional safeguards of the Fourth Amendment were not invoked." *Id.* at 523 n. 3, 103 S.Ct. at 1338 n. 3.

clear that Wright was not seized within the context of the Fourth Amendment until she was placed under arrest.

Wright's initial encounter with Officer Johnson was purely consensual. When Johnson approached Wright, he asked if he could speak with both her and the black male accompanying her. Johnson's tone of voice was neither coercive nor intimidating. The fact that the black male refused to speak with Johnson and walked away from the Officer in Wright's presence supports this conclusion. Neither Johnson nor the other Task Force Agents standing nearby took any action to detain the male suspect. Wright observed her companion leave the area with impunity. Her companion's personal liberty was in no way constrained. Johnson's initial approach constituted nothing more than mere police-citizen communication.

At no time prior to her arrest was Wright's encounter with Officer Johnson and Agent Jones converted into a seizure which implicates the Fourth Amendment. The fact that the Officers identified themselves as narcotics or immigration agents does not make it otherwise.[9] Wright was never informed that she was a suspected drug courier.[10] While Officer Johnson asked to see Wright's airline ticket and personal identification, he promptly returned these items to her.[11] Johnson asked Wright a few routine questions regarding the purpose of her trip to Dallas and the whereabouts of her luggage. Johnson's encounter with Wright was brief: it lasted less than two minutes.

Agent Jones, who had been standing nearby, was able to overhear Johnson's brief questioning of Wright. When he approached, it was unnecessary to repeat the questions Johnson had asked. He merely asked Wright which country she was a citizen of, and when being informed that she was a citizen of Jamaica permanently residing in this country, he asked for proof of alien registration. When Wright could not provide the requisite proof, probable cause existed for her arrest.[12] Wright's encounter with both Officer Johnson and Agent Jones lasted no longer than four or five minutes.

Based on the record presented, no seizure of Wright occurred anytime prior to her arrest by Agent Jones for an alleged violation of the immigration laws. It is true that Wright was never told that she was free to leave or to refuse to speak with Johnson or Jones. While the Officers' failure to do so is "highly relevant," it is neither dispositive nor constitutionally required.[13] As the Supreme Court wrote in *Royer*, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."[14]

As no seizure of Wright occurred until there was probable cause for her arrest, the Court need not address the issue of whether there was a reasonable and articulable suspicion prior to her arrest sufficient

9. *Royer,* 460 U.S. at 497, 103 S.Ct. at 1323–24.

10. *Cf. United States v. Hanson,* 801 F.2d 757, 761 (5th Cir.1986) (seizure of defendant occurred when he was asked to step aside, his drivers license was retained, and he was informed that he was suspected of carrying narcotics).

11. *Cf. United States v. Morin,* 665 F.2d 765, 769 (5th Cir.1982) (confiscation of defendant's airplane ticket in addition to other factors effectively placed him under arrest).

12. The Immigration and Nationality Act, provides:

Every alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him.... Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both.

8 U.S.C.A. § 1304(e) (West 1970).

13. *Mendenhall,* 446 U.S. at 559, 100 S.Ct. at 1879; *United States v. Robinson,* 625 F.2d 1211, 1218 (5th Cir.1980).

14. 460 U.S. at 497, 103 S.Ct. at 1324.

to justify a *Terry*-type detention.[15] Having concluded that Wright's interaction with Officer Johnson and Agent Jones prior to her arrest was no more than a permissible police encounter in a public place, the Court now turns its attention to a more difficult issue.

### B. Whether the Warrantless Seizure of Wright's Suitcase was a Constitutional Infraction

Officer Johnson removed Wright's suitcase from an American Airlines storage facility without a warrant. Having identified himself as a narcotics officer, an American Airlines employee permitted Johnson to enter the facility where unclaimed luggage is stored by the airline. As Johnson was in possession of Wright's baggage claim stub, the employee allowed Johnson to remove the suitcase from the storage facility. Before the Court determines whether Johnson's retrieval of Wright's suitcase implicates Fourth Amendment analysis, the Court notes that at least two alternative, and indeed preferable, methods of gaining custody of the suitcase were available to the Task Force Officers.

First, Johnson could have obtained Wright's consent to the removal of her suitcase from the storage facility. Wright was administratively detained for an alleged violation of the immigration laws. Her consent to claim and remove the suitcase could have easily been obtained.

Wright had cooperated fully with the Officers throughout her initial encounter with and even after her subsequent arrest. The record contains not a single inference that she would have refused Johnson access to the suitcase. Clearly no exigency existed that Wright would claim the suitcase and flee. She was in custody; Johnson was in possession of the baggage claim stub.

■ Second, the Task Force Officer could have obtained a search warrant. The record indicates that at the time of Wright's arrest at least five dogs trained to detect narcotics were available somewhere on the airport's premises.[16] Johnson removed the suitcase from the storage shortly after the noon hour. At this time, the services of a magistrate and a trained dog handler could have easily been obtained. "The courts are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage."[17] A positive result would have provided probable cause for the issuance of a search warrant.[18] A negative result would have dispelled Johnson's suspicions in short order. The suitcase could have lawfully been secured in the storage facility while the Officers obtained a warrant to search it.[19]

Although Officer Johnson's warrantless removal of the suitcase was not the preferred method of obtaining proper authority to search it, the Government still contends that his actions may lie within the sphere of legitimate investigatory con-

---

**15.** *See Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968); *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

**16.** Agent Jones testified that United States Customs Agents utilized 4 such dogs at DFW; the DEA Task Force also maintained one.

**17.** *Royer*, 460 U.S. at 505, 103 S.Ct. at 1328.

**18.** This was precisely the investigatory method employed by Border Patrol agents in *United States v. Lovell*, 849 F.2d 910, 911 (5th Cir.1988). After border patrol agents removed the defendants' luggage from a conveyor belt, compressed the sides of the suitcases, and detected a strong odor of marijuana, a narcotics sniffing dog was brought to the airport and alerted on

the suitcases. A search warrant was obtained and the baggage opened. Inside 68 pounds of marijuana was discovered in tightly wrapped bundles. *Id. See infra* note 29 and accompanying text.

**19.** If a narcotics-sniffing dog had alerted on Wright's luggage, then Officer Johnson would have had probable cause for the seizure, not the necessarily removal, of Wright's luggage. The Supreme Court has upheld warrantless seizures of property on the basis of probable cause for the time necessary to obtain a warrant, especially where a warrantless search would have been impermissible. *Segura v. United States*, 468 U.S. 796, 806, 104 S.Ct. 3380, 3386, 82 L.Ed. 2d 599 (1984) (citation omitted). *See also United States v. Kinebrew*, 507 F.Supp. 17, 20 (E.D. N.Y.1980).

duct.[20]  Three possible theories exist upon which Johnson's removal of the suitcase from the storage facility without a warrant could be justified.

First, Johnson's conduct may be sanctioned by a well-recognized exception to the Fourth Amendment's warrant requirement. If the suitcase was "seized" within the context of the Fourth Amendment, then Johnson's exercise of temporary control and custody of the suitcase may have been permissible under the principles set forth in *Terry v. Ohio* [21] and made applicable in this context in *United States v. Place* [22].  Of course the purported seizure would have to be supported by an articulable suspicion that the suitcase was used, or about to be used, in the course of committing a crime.[23] Second, an officer may, without a warrant, search a person who has been validly arrested.[24]  Third, "an inventory search may be reasonable under the Fourth Amendment even though it is not conducted pursuant to a warrant based upon probable cause." [25]  In the inventory-search context, "the salutary functions of a warrant simply have no application...." [26]

### 1. Temporary Detention of Luggage under *U.S. v. Place*

■  "A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property." [27]  Officer Johnson's warrantless removal of the suitcase from the airline storage facility was a "seizure" within the context of the Fourth Amendment. When the suitcase was removed, it was under the custody and control of American Airlines, an independent third party who, in effect, was acting as a "bailee" for Defendant Wright.  Wright clearly maintained a reasonable expectation of privacy in the suitcase; [28] she had not abandoned it.

A recent series of Fifth Circuit cases does not make it otherwise.  In the *Lovell* series, the court held that the momentary removal of a suitcase from a baggage area conveyor belt, coupled with the officer's compression of the sides of the suitcase to procure a scent, did not constitute a Fourth Amendment "seizure." [29]  The officers' brief removal and compression of the suit-

**20.** The Supreme Court of the United States wrote in *Terry v. Ohio*, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875–76, 20 L.Ed.2d 889 (1967): "The exclusionary rule has its limitations, however, as a tool of judicial control.  It cannot properly be invoked to exclude the products of legitimate police investigative techniques on the ground that much conduct which is closely similar involves unwarranted intrusions upon constitutional protections."

**21.** 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967).

**22.** 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

**23.** "When police seize luggage from the suspect's custody, we think the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause." *Place*, 462 U.S. at 708, 103 S.Ct. at 2645.

**24.** *Michigan v. DeFillippo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979).

**25.** *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987).

**26.** *Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983) (quoting

*United States v. Chadwick*, 433 U.S. 1, 10 n. 5, 97 S.Ct. 2476, 2482 n. 5, 53 L.Ed.2d 538 (1977)).

**27.** *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).

**28.** The fourth amendment protects the "right of the people to be secure in their persons, houses, papers, *and effects*, against unreasonable searches and seizures." (Emphasis added.)  *See Arkansas v. Sanders*, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979) ("[L]uggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy"); *United States v. Chadwick*, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977) ("[A] person's expectations of privacy in personal luggage are substantially greater than in an automobile").

**29.** *See United States v. Lovell*, 849 F.2d 910 (5th Cir.1988) (discussed *supra* note 18); *United States v. Garcia*, 849 F.2d 917 (5th Cir.1988); *United States v. Roman*, 849 F.2d 920 (5th Cir. 1988); *United States v. Cagle*, 849 F.2d 924 (5th Cir.1988); *United States v. Karman*, 849 F.2d 928 (5th Cir.1988); *United States v. Hahn*, 849 F.2d 932 (5th Cir.1988); *United States v. Jaquez*, 849 F.2d 935 (5th Cir.1988); *United States v. Sawyer*, 849 F.2d 938 (5th Cir.1988); *United States v. Gutierrez*, 849 F.2d 940 (5th Cir.1988).

cases in the *Lovell* series cannot be analogized with Officer Johnson's acquisitive conduct here.

Officer Johnson assumed authority over the third-party common carrier who had custody of Wright's luggage. Without Wright's permission, and ostensibly motivated by the desire to find narcotics, Johnson did more than "momentarily" remove Wright's suitcase from a conveyor belt. He transported it from a secured storage area to another terminal. Johnson's professed concern over Wright's belongings does not lessen the intrusion. Safe within the custody of the carrier, Wright's suitcase was secure; no exigency required that it be immediately swept into police custody. The suitcase had remained in the storage facility for a very short time, little more than an hour. Wright had retained her baggage claim stub. Whatever her reasons were for not retrieving the suitcase upon deplaning—whether her failure to identify the suitcase on the carousel was mistaken or purposeful—she completed a lost baggage claim form and indicated a desire that the suitcase be returned to her by the carrier.

Officer Johnson knew that Wright had completed the baggage claim form. When he observed the grey, soft-sided suitcase secured in the American Airlines' storage facility, he proceeded to find an American Airlines employee, identified himself as a police officer, and displayed his identification. Wright's baggage claim stub was already in Johnson's possession. Agent Jones had removed it from Wright's ticket folder after her arrest. Acting under the color of law, Officer Johnson claimed the suitcase and removed it from the storage facility. It was Johnson who was now exercising control over the suitcase, not the airline. Officer Johnson had thus "seized" the suitcase within the context of the Fourth Amendment.[30]

In *United States v. Place*,[31] the Supreme Court of the United States held that a law enforcement officer may seize property if he has a reasonable and articulable suspicion that the property contains contraband or evidence of a crime. The detention must be "sufficiently limited" in time, and the investigatory technique utilized must be the "least intrusive means reasonably available."[32] Under the *Place* holding, the *Terry*-type detention of luggage is justified by "the inherently transient nature of drug courier activity at airports."[33] The Supreme Court found that the drug courier's mobility and the government's interest in enforcing narcotics laws were sufficient reasons to sanction "brief investigative stops of persons at airports on reasonable suspicion of drug-trafficking...."[34] The investigative stop "substantially enhances the likelihood that police will be able to prevent the flow of narcotics into distribution channels."[35] In *Place*, the impending departure of the suspect created an exigency which justified a temporary warrantless seizure of his luggage.

The facts which give rise to the seizure of the suitcase in this case are totally inapposite to those of *Place*. No exigency existed which created a need for an immediate seizure or search of Wright's suitcase. Wright was not about to depart—she was under arrest and held in custody at the Task Force Office. Wright's suitcase was not transitory—it was completely immobilized. The suitcase was in the possession of the airline, visibly maintained in a locked storage facility guarded by airline personnel. The suitcase could have been easily secured until a warrant was obtained. Under the facts as developed in this case, it appears that the only possible

---

**30.** *Cf. United States v. Jacobsen*, 466 U.S. 109, 120–121, 104 S.Ct. 1652, 1660, 80 L.Ed.2d 85 (1984) (DEA agent's removal of four visible plastic bags from 10–inch–long cylindrical tube concealed inside a package constituted a "seizure" within the meaning of the fourth amendment.).

**31.** 462 U.S. 696, 708–710, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983).

**32.** *United States v. Sanders*, 719 F.2d 882, 887 (6th Cir.1983). *See also United States v. Puglisi*, 723 F.2d 779 (11th Cir.1984).

**33.** *Place*, 462 U.S. at 704, 103 S.Ct. at 2643.

**34.** *Id.*

**35.** *Id.*

means of developing probable cause was through the use of a narcotics detection dog.[36] The evidence adduced at the suppression hearing indicates that a canine sniff was an available and viable option, especially when Wright and her suitcase were stationary. Officer Johnson chose instead to merely seize the suitcase upon the display of his badge and a show of authority. In the absence of an exigency sufficient to justify a warrantless seizure, the exception to the warrant requirement established by the *Place* decision is without application.

■ Even assuming that the *Place* decision was controlling here, it is easily shown that Officer Johnson had no reasonable or articulable suspicion that Wright was transporting narcotics in her suitcase. Wright was under arrest for a possible immigration law violation, not for narcotics trafficking. Prior to her arrest, Johnson's brief questioning of Wright disclosed no evidence or information which would support a reasonable belief that narcotics were contained in her suitcase, nor is there any evidence that the Officers believed that her alien registration papers were contained there. A charitable review of the record unearths no more than a few drug courier profile characteristics which may have aroused Johnson's suspicion: namely, that Wright (1) appeared nervous and watchful; (2) arrived from a "target" city for narcotics; (3) used a pay telephone after deplaning; and, (4) chose not to speak with the black male suspects with whom she "made eye contact" in the baggage claim area.

It is well settled in this Circuit that a match between profile characteristics and characteristics exhibited by a defendant will "not, in and of itself, create a reasonable suspicion sufficient to justify an investigatory stop." [37] In *Reid v. Georgia*,[38] the Supreme Court of the United States, when confronted with suspicions based on information similar to that in the present case, quickly condemned it as insufficient to support a *Terry*-type detention. In *Reid*, DEA agents believed two men fit the drug courier profile because: (1) they had arrived from Fort Lauderdale, a cocaine source city; (2) they arrived in the early morning when law enforcement activity is diminished; (3) they appeared to conceal the fact they were traveling together; and (4) they apparently had only their shoulder bags as luggage.[39] The Court noted that the circumstances observed by the agents "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." [40]

Although Officer Johnson stated that his retrieval of Wright's suitcase was prompted by the instructions of Agent Jones and Jones' professed concern for the safety of Wright's personal belongings, Johnson also testified that he believed the suitcase contained narcotics. In light of the facts known to Johnson at the time, his belief was nothing more than an unarticulable hunch. He took it upon himself to seize Wright's luggage from the locked storage facility—Agent Jones believed the suitcase would be arriving on the next incoming New York flight—and transported it to another airline terminal despite his ability to articulate any reasonable basis for believing that Wright was transporting narcotics.

---

**36.** In *Place*, Justice O'Connor noted that "the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." 462 U.S. at 707, 103 S.Ct. at 2644–45.

**37.** *United States v. Berry,* 670 F.2d 583, 600 (5th Cir.1982) (Unit B) (en banc); *United States v. Hanson,* 801 F.2d 757, 762 (5th Cir.1986).

**38.** 448 U.S. 438, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (per curiam).

**39.** *Reid,* 448 U.S. at 441–42, 100 S.Ct. at 2754.

**40.** *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754. *See also United States v. Glass,* 741 F.2d 83, 85 (5th Cir.1984). In *Glass,* reasonable suspicion to detain the defendant could not be supported by the fact that he: (1) arrived from a source city; (2) recognized another individual upon deplaning; (3) travelled under an assumed name; and, (4) had become known to the arresting officer through a "tip" received from a DEA agent in another city.

The *Terry*-type detention of personal effects permitted by the Supreme Court in *United States v. Place* has no application under the facts of this case.

### 2. Search Incident to Arrest

■ The theory that Wright's suitcase was removed from the storage facility as "incident" to a valid arrest is also untenable. The "search incident" exception to the warrant requirement permits an arresting officer "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."[41] Under the "search incident" exception, the Government's interest in protecting the arresting officer and preserving evidence provides "ample justification ... for a search of the arrestee's person and the area within his immediate control."[42]

Officer Johnson's seizure of the suitcase from the storage facility was hardly incident to Wright's arrest. The suitcase had been removed from the baggage carousel by an airline employee and placed in the storage facility *before* she was placed under arrest. By the time Officer Johnson became suspicious that the gray, soft-sided suitcase he had observed earlier might belong to Wright, more than an hour had passed since her arrest. When Johnson seized the suitcase, it was safely secured in the storage facility—clearly it was not in Wright's possession.[43] At the time of the

---

**41.** *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

**42.** *Chimel,* 395 U.S. at 763, 89 S.Ct. at 2040.

**43.** The Government has never suggested that the suitcase was in Wright's "constructive" possession. The Court's exhaustive research uncovered only one case, of absolutely no value as precedent, which has ever propounded such a theory.

A three-judge panel of the District Court of Appeals of Florida in *Royer v. State of Florida* wrote:

In the instant case the defendant's suitcases were immediately associated with him. Until he checked them (upon purchasing his ticket), he had actual possession. When the suitcases were checked and he held the check stub, he was in constructive possession thereof. Moreover, in this case the impending departure of the person with his suitcases constituted an exigency creating need for immediate search. 389 So.2d 1007 (1979). The panel decision was vacated and rehearing en banc granted. *Id.* at 1015 (1980). The en banc Court reversed Royer's conviction, finding that Royer's consent to the search of his suitcases was the tainted product of an unlawful confinement unsupported by probable cause. The Supreme Court of the United States affirmed the reversal of Royer's conviction on the same grounds. *Royer,* 460 U.S. at 507–508, 103 S.Ct. at 1329. In light of this finding, neither the en banc Court nor the Supreme Court was required to consider the issue whether the warrantless seizure of Royer's suitcases was constitutional.

Justice White's factual recitation in *Royer,* however, casts substantial doubt on the viability of a "constructive possession" theory. He wrote: *"Without Royer's consent or agreement,* Detective Johnson, using Royer's baggage check stubs, retrieved the ... luggage from the airline...."* *Royer,* 460 U.S. at 494, 103 S.Ct. at

1322 (emphasis added). Even if such a theory had been sanctioned, the facts of this case are clearly distinguishable.

In *Royer,* the defendant was attempting to board a departing flight. His luggage had already been loaded aboard the plane. Two exigencies existed. First, the defendant was about to flee; second, incriminating evidence was about to be removed from the jurisdiction. There was no time to obtain an arrest or search warrant.

No similar exigencies were present in this case. Wright was already in custody at the time of Officer Johnson's warrantless seizure. Her suitcase was safely contained in the airline storage facility. Presuming Officer Johnson had probable cause to believe the suitcase contained narcotics, he could have secured the storage facility and the suitcase until a warrant was obtained.

The case of *Benitez-Mendez v. I.N.S.,* 760 F.2d 907 (9th Cir.1985) adds nothing to a relevant theory of constructive possession in the context of a search and seizure of personal effects. In *Benitez,* the defendant was seized within the context of the fourth amendment when he was placed inside a police vehicle and told to wait. The defendant was detained for an alleged violation of 8 U.S.C. § 1304(e) which requires an alien to carry documents showing his legal status. The Ninth Circuit Court of Appeals held that the defendant had been unlawfully seized because his statement to the arresting officers that his documents were in a nearby car should have dispelled any suspicion that he was in violation of section 1304 until his statement could be verified. The Court held that the defendant's documents were "constructively" in his possession.

The *Benitez* case has no application here. The case stands for no more than the proposition that a legal alien does not have to physically carry his alien registration papers on his person in order to comply with section 1304(e). The

seizure, Wright and the suitcase were located in separate airport terminals. There was no danger that Wright would attempt to retrieve a weapon from the suitcase or destroy any evidence that might be contained inside it. As Justice Black wrote, "[o]nce an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest."[44]

### 3. The Inventory–Search Exception

■ Nor does the inventory-search exception to the Fourth Amendment's warrant requirement justify Officer Johnson's seizure of the suitcase. The reason is obvious. The initial issue when determining the application of this exception is not whether the *search* of the suitcase was valid—in this case, the Government contends that Wright allegedly consented to the search—but whether the *seizure* of the suitcase could provide a permissible justification for a subsequent warrantless search of its contents.

The inventory-search exception can only be applied when the police have lawfully seized the item or container to be searched. The initial intrusion must be a justifiable one; an impermissible seizure will taint a subsequent search.[45] Lawful authority to seize may be derived from statute or ordinance,[46] or from an exception to the warrant requirement,[47] such as a search incident to a lawful arrest.[48] But to extend

the scope of the inventory-search exception to the seizure of objects—not in the arrestee's possession or immediate control both at the time of arrest—which the police discover after the arrestee is in custody "would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure."[49]

Even assuming that the inventory-search exception somehow justified Officer Johnson's warrantless seizure of the suitcase, none of the policy considerations which generally justify an inventory search are present in this case. Wright's suitcase was under locked guard by an independent third-party to whom it had been entrusted. There was no danger that the suitcase would be lost or stolen or that the police might be subject to liability for a false claim that some or all of its contents were missing. Agent Jones stated that if he obtained satisfactory information from New York, verifying Wright's status as a legal alien, she would be released without being placed in jail. He also stated that even if she were to be incarcerated her belongings could not accompany her because the jail would not accept them. "Inventory searches must be limited to effectuation of the recognized purposes for which they are conducted and they may not be used as a pretext for intrusive investigatory searches that would otherwise be impermissible."[50]

case has no relevance, nor does it even suggest some relationship, to the *Terry*-type detention of luggage or the scope of a lawful search made incident to arrest.

**44.** *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964).

**45.** *Coolidge,* 403 U.S. at 473, 91 S.Ct. at 2042; *United States v. Jeffers,* 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951) ("The search and seizure are ... incapable of being untied.").

**46.** *See, e.g., South Dakota v. Opperman,* 428 U.S. 364, 375, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976) (inventory search of unlocked glove compartment upheld where automobile lawfully impounded for parking violations); *Cooper v. California,* 386 U.S. 58, 61, 87 S.Ct. 788, 790–91, 17 L.Ed.2d 730 (1967) (search of car lawfully impounded in connection with defendant's arrest for narcotics distribution upheld).

**47.** *See, e.g., Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (when probable cause exists to search an entire vehicle under the automobile exception, containers or packages found inside may also be searched if they could conceal the object of the search).

**48.** *See, e.g., Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987) (search of defendant's backpack discovered during routine inventory of defendant's van upheld where the van was lawfully seized in connection with defendant's arrest). *Illinois v. Lafayette,* 462 U.S. 640, 648, 103 S.Ct. 2605, 2610–11, 77 L.Ed. 2d 65 (1983) (container or article in possession of arrested person may be searched according to routine inventory procedures).

**49.** *Coolidge,* 403 U.S. at 471, 91 S.Ct. at 2041.

**50.** *United States v. Prescott,* 599 F.2d 103, 105 (5th Cir.1979).

The preliminary issue to be determined is whether Officer Johnson's warrantless *seizure* of the suitcase was permissible. As the seizure of the suitcase occurred prior to the *search*, the legitimacy of the seizure must be the threshold determination. The inventory-search exception cannot be used to justify Officer's Johnson's initial seizure of the suitcase more than an hour after Wright's arrest when the suitcase was neither in Wright's possession at the time of her arrest nor when there was no danger that the suitcase would be removed from the airline premises before a warrant could be obtained.[51] In the context of this case, the application of the inventory-search exception is inappropriate.

As no lawful justification has been established for the seizure of the suitcase, the Government has failed to demonstrate an exception to the warrant requirement which would sanction Officer Johnson's conduct.[52] "The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se unreasonable' in the absence of 'exigent circumstances.'"[53]

### C. The Fruit of the Poisonous Tree

■ Evidence which is the direct or indirect product of unlawful government conduct must be excluded on Fourth Amendment grounds.[54]

Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion. The question to be resolved when it is claimed that evidence subsequently obtained is "tainted" or is "fruit" of a prior illegality is whether the challenged evidence was "come at by exploitation of the [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint."[55]

In this case, Wright's alleged consent, if any, to the search of her suitcase is the tainted product of an impermissible seizure. Her alleged consent was clearly obtained through the exploitation of the initial illegal seizure of the suitcase. No intervening circumstances arose to purge the taint of the illegal seizure. Immediately upon seizing the suitcase from the storage facility, Officer Johnson returned to the Task Force Office where Wright was held in order to obtain her alleged consent. Her purported consent is the direct result of Officer Johnson's unlawful seizure of the suitcase. This illegality taints Wright's consent, if any, to the search. The package of cocaine discovered inside the suitcase as a result of its unlawful seizure and Wright's alleged, though tainted, consent is, of course, the "fruit of the poisonous tree."[56] It must be suppressed.

### D. Voluntary Consent

■ The Government bore the burden of proving by clear and convincing evidence that the necessary consent was obtained and that it was freely and voluntarily given.[57] Even if Wright's alleged consent was not the tainted product of an unlawful seizure of her suitcase, the Government has failed to prove, by clear and convincing

**51.** *See Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 741–742, 93 L.Ed.2d 739 (1987). *See also United States v. Johnson*, 846 F.2d 279, 282 (5th Cir.1988) (citing *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 2485–86, 53 L.Ed. 2d 538 (1977) (inventory search must be contemporaneous with the arrest).

**52.** *See United States v. Vasey*, 834 F.2d 782 (9th Cir.1987) (citing *United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951)).

**53.** *Coolidge*, 403 U.S. at 470, 91 S.Ct. at 2040.

**54.** *Segura v. United States*, 468 U.S. 796, 804– 805, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984). *See also Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *Wong*

*Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963).

**55.** *Segura*, 468 U.S. at 804–805, 104 S.Ct. at 3385.

**56.** *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939) (evidence derivative of an illegality). *See also Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968).

**57.** *United States v. Barker*, 722 F.2d 179, 182 (5th Cir.1983). *See also Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979).

evidence, that Wright's consent was either obtained or voluntarily given.

One of the six primary factors which a court must consider when determining whether consent was knowing and voluntary is "the voluntariness of the defendant's custodial status." [58] In this case, Wright was *in custody;* her alleged consent was not obtained after a brief conversation in an open, public, and neutral setting, such as the walkway of an airport terminal.[59] Wright was under arrest and detained at the offices of Immigration Services at DFW. Written consent forms were available, yet Officer Johnson chose not to use them. While Officer Johnson testified that Wright expressed her verbal consent to the search, Agent Jones, who was present, could not confirm Johnson's testimony. On cross-examination, Jones testified that Wright's "consent" might have been nothing more than a mere "shrugging of her shoulders."

Conspicuously absent from Officer Johnson's affidavit submitted in support of the criminal complaint in this case is any mention of Wright's consent to the search of her suitcase. Further, the fact that Wright did not have a key to the suitcase, or failed to provide one, mitigates against a finding of consent. The fact that a surrogate key had to be selected from a set of suitcase keys maintained by the DEA further supports a finding that Wright's alleged consent was nothing more than coerced acquiescence. As the Fifth Circuit noted in *United States v. Berry,* "in such a situation it would be easy to misinterpret acquiescence to an officer's demands as consent; acquiescence cannot, of course, substitute for free consent." [60]

Based on the record thus developed, the Government has failed to prove by clear and convincing evidence that Wright, while in custody, consented to the search of her suitcase or that her consent was knowing and voluntary.[61]

E. Conclusion

The Court is not unmindful of the enormous and difficult task law enforcement officers are faced with when attempting to combat drug trafficking. This Court has been the beneficiary of the professionalism of DEA Task Force officers in this highly specialized area for many years. Their work was been diligent and able, the officer dedicated and competent. While the drug trafficking enterprise must be stopped, the end will not justify the means if "more than lip service" [62] is to be paid to core constitutional interests. "[I]llegitimate and unconstitutional practices get their first footing ... by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed." [63]

The Supreme Court of the United States "has viewed the seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." [64] Officer Johnson's warrantless seizure of Defendant Wright's suitcase violated this rule and tainted Wright's alleged consent to the search of its contents. In the language of the "time-worn metaphor," the narcotics discovered inside the suitcase

---

**58.** *United States v. Gonzales,* 842 F.2d 748, 754 (5th Cir.1988).

**59.** *Cf. Gonzales,* 842 F.2d at 754 (where DEA agents did not confine defendant in small area, this factor, among others, supported the district court's finding of voluntary consent).

**60.** 670 F.2d 583, 596 (5th Cir.1982) (en banc) (citing *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)).

**61.** Since the Court has found that Wright did not consent to the search of her suitcase, the Court need not reach the more difficult issue

whether Wright was properly *Mirandized,* as the testimony of Agent Jones and Officer Johnson is, in this area too, inconsistent if not conflicting.

**62.** *Segura,* 468 U.S. at 840, 104 S.Ct. at 3404 (Stevens, J., dissenting).

**63.** *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1986) (Bradley, J.).

**64.** *Place,* 462 U.S. at 701, 103 S.Ct. at 2641.

were the "fruit of the poisonous tree." [65] The exclusionary rule must be applied to deprive the authorities of the advantage they gained through the unconstitutional seizure of Wright's suitcase.

## ORDER

In view of the foregoing, Defendant Wright's motion to suppress the evidence identified in the indictment is GRANTED. Because the suppressed matters appear to be essential to prosecution, counsel are directed to appear at a status call at 1:45 p.m., February 24, 1989, to discuss any anticipated further proceedings. Defendant Wright's presence at that status call is waived.

**65.** *Harrison v. United States,* 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968).