UNITED STATES of America, Plaintiff,

v.

Medhi TEHRANI and Amir
Alaei, Defendants.

Crim. Nos. 2:92–CR–102–
01, 2:92–CR–102–02.

United States District Court,
D. Vermont.

June 22, 1993.

Paul Van De Graaf, Asst. U.S. Atty., Burlington, VT, for U.S.

John Pacht, Hoff, Agel, Curtis, Pacht & Cassidy, P.C., Burlington, VT, for defendant Tehrani.

Bradley Stetler, Burlington, VT, for defendant Alaei.

## OPINION AND ORDER

PARKER, Chief Judge.

■ On December 10, 1992, a federal grand jury handed down an indictment charging the defendants, Medhi Tehrani and Amir Alaei, with: (1) conspiring to knowingly possess counterfeit credit cards with intent to defraud in violation of 18 U.S.C. § 1029(a)(3); and (2) knowingly possessing counterfeit credit cards, and aiding and abetting the possession of twenty counterfeit credit cards, with intent to defraud, in violation of 18 U.S.C. § 1029(a)(3) and 18 U.S.C. § 2. The defendants filed motions to suppress based on violations of their Fourth Amendment rights and their rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[1] A hearing on the matter was held on May 10, 1993.

---

1. Although not an issue raised by the parties in this case, there is a preliminary matter of jurisdiction, in particular, the issue of the defendants' standing to raise the defenses asserted herein. In *United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), the Supreme Court firmly rejected the argument that all aliens enjoy certain constitutional rights. *Id.* 494 U.S. at 270–72, 110 S.Ct. at 1064.

 Discussing cases supporting the notion of extending constitutional protections to aliens, the Court noted that "[t]hese cases, however, establish only that aliens receive constitutional protec-

tions when they have come within the territory of the United States *and developed substantial connections with this country.*" *Id.* (emphasis added). All of these cases involved resident aliens or illegal aliens who had been in this country for a significant period of time, persons whom the Court found had developed substantial connections by virtue of their status or residence in this country. The Court went on to hold that an alien extradited to the United States who had no previous voluntary connection with this country cannot assert Fourth Amendment rights to challenge an extraterritorial search of his property. *Id.*

## Findings of Fact

The Court finds from the evidence as follows:

1. On the morning of November 13, 1992, U.S. Border Patrol Agent Paul Moran ("Agent Moran") was assigned to the Burlington International Airport in Burlington, Vermont, for the purpose of detecting and apprehending illegal aliens.[2] Agent Moran has eight years of experience with the Border Patrol. That morning he was dressed in plain clothes.

2. Vermont State Trooper Paul Cucinelli ("Trooper Cucinelli") was also present at the Burlington International Airport on the morning of November 13, 1992. He had been assigned to an interdiction unit for the purpose of viewing passengers' activities. In addition, he assisted Agent Moran upon request. The Vermont State Police Department maintains a office on the second floor of the airport terminal for the use of law enforcement personnel assigned to the airport interdiction unit.

3. Traffic was light at the airport terminal that morning. At approximately 10:30 A.M., Agent Moran was on the ground floor of the terminal and noticed three male persons of middle eastern descent enter through the center entrance. Because they were wearing "designer type" clothing and appeared to be of Middle Eastern descent, Agent Moran suspected that these three individuals might be from Canada. He grew up in Vermont, has spent time in Montreal, Canada, and perceives that there is a clear distinction between the way people dress in Montreal and the way they dress in Vermont. Moreover, he knew that many Middle Eastern aliens are apprehended by the U.S. Border patrol entering the United States from Canada in nearby Swanton, Vermont.

4. Agent Moran observed the three individuals for a time. They initially split up, each walking around the airport as though they were scouting something out. One of the individuals, later identified as the defendant, Medhi Tehrani ("Tehrani"), made eye contact with Agent Moran on several occasions. After about five minutes, the three individuals regrouped and approached the Business Express ticket counter. Tehrani and another individual, later identified as Amir Alaei ("Alaei"), appeared to transact business at the ticket counter and checked two pieces of luggage.

5. After transacting business at the ticket counter, the three individuals walked to the south side of the terminal. Alaei and the third unidentified man sat in the waiting area while Tehrani stood. At some point during this period of time, Agent Moran contacted Trooper Cucinelli, who was also on the ground floor of the terminal, and requested his assistance in watching the three men Agent Moran had been observing.

6. Agent Moran thereafter approached the Business Express ticket counter and spoke with the ticket agent. She informed Agent Moran that the individuals had previously come to the airport on several occasions, but had never flown out. On those occasions, they made reservations, but did not purchase tickets. On this occasion Tehrani had purchased two one-way tickets to Las Vegas, Nevada, with a Visa credit card. At that point the ticket agent told Agent Moran that one of the individuals was right behind him. Agent Moran turned around to see Tehrani hastily leave the terminal. Trooper Cucinelli was nearby and Agent Moran requested that he accompany him outside to ask Tehrani some questions. Trooper Cucinelli agreed to do so and the two walked out of the terminal together.

7. Tehrani was seen heading into the short-term parking area directly in front of the airport terminal. Agent Moran believed that Tehrani was heading to a vehicle. Teh-

Lawful but involuntary presence "is not the sort to indicate any substantial connection with our country." *Id.* In the case at bar, however, the defendants presence in the United States was voluntary, and they had gained admission, albeit surreptitiously, for a temporary visit as tourists. Such connections are thus distinguishable from those in *Verdugo–Urquidez* and constitute the type of connections which would vest in aliens the protections afforded by the Fourth Amendment and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The U.S. Border Patrol is a division of the Immigration and Nationalization Services ("INS") Office of Enforcement. 8 U.S.C. § 1103; 8 C.F.R. § 100.2; 28 C.F.R. § 0.105.

rani turned around when he reached the middle of the parking area, saw Agent Moran and Trooper Cucinelli approaching him and walked toward them. The three met on the edge of the parking lot, a short distance from the entrance to the terminal.

8. Agent Moran identified himself and Trooper Cucinelli and inquired of Tehrani where he was from and requested that he identify himself. Tehrani spoke defensively, and stated that the only reason the officers were stopping him was because he was Iranian. He also stated that he would sue the two officers because they had no right to stop him; he continued walking toward the terminal. No restraint was made on his ability to continue walking. Agent Moran then stated that he simply wanted to ask Tehrani a few questions. Tehrani said he was from Canada. Agent Moran asked him how he got to the Burlington airport and Tehrani replied that he had walked from Canada.[3] When asked if he was travelling with anyone, Tehrani stated that he had no travelling companions. Agent Moran also asked Tehrani where he entered the United States, to which Tehrani replied "Burlington."[4] However, he would not identify himself, nor produce identification, despite being asked to do so. These responses raised Agent Moran's suspicions regarding Tehrani's presence in the United States. He told Tehrani that as a foreign citizen, he was required to carry identification documents and that it was a violation of law not to produce them upon request from a U.S. Border Patrol agent. He further stated that he, Moran, had a right to demand that Tehrani produce such documentation.

9. No physical touching had occurred, no weapons had been displayed, nor had Tehrani been told that he could not leave. However, Agent Moran believed at this point that before allowing Tehrani to proceed with his travel plans, he, Moran, had a duty to determine Tehrani's identity, his citizenship and whether he had been properly admitted and inspected before entering the United States.

10. Up until this point, Trooper Cucinelli had made no inquiries and had maintained a slight distance from Agent Moran and Tehrani while they spoke. Recognizing that Tehrani was upset, and trying to calm him down, Trooper Cucinelli suggested that this was not a big deal, and that they should go to his office inside the terminal for further discussion. Tehrani agreed to do so. Having walked toward the terminal during their brief conversation, the three were now quite close to the terminal entrance. Trooper Cucinelli escorted Tehrani into the terminal and up to the State Police office on the second floor of the terminal. Upon entering the office, which was a small room without windows, Trooper Cucinelli offered Tehrani a seat and told him they should wait for Agent Moran. The door was left open. It was approximately 10:40 A.M.

11. Agent Moran had departed from Trooper Cucinelli and Tehrani upon reaching the terminal doors and had gone to the south side of the terminal to speak with Alaei, who was still seated in a waiting area inside the terminal. The third individual was not in sight. Agent Moran identified himself to Alaei and displayed his credentials. He asked Alaei where he was going. Alaei responded, "Las Vegas," which Moran knew to be the truth. Agent Moran then asked Alaei where he resided. Alaei produced a citizen card from Canada which appeared legal and valid to Agent Moran. He further inquired as to where Alaei entered the United States. Alaei could not say where, but stated that he had travelled in a jeep and that he was travelling with Medhi Tehrani. Agent Moran then asked Alaei if he would accompany him to an office upstairs. Alaei was not told he was free to leave. In fact, at this point, because Alaei could not say where he had entered the United States, and because he had said he was travelling with Tehrani who had given an inconsistent story, Agent Moran believed that before allowing Alaei to proceed with his travel plans, he should determine that Alaei had been properly admitted

---

**3.** Since the Burlington International Airport is some forty miles from the United States/Canada border, this statement was preposterous in the circumstances. It was probably flippant.

**4.** Other than by air travel, it is not possible to enter the United States at Burlington if one is travelling from Canada.

and inspected before entering the United States, and was entitled to remain.

12. Once both Tehrani and Alaei were in the office, Agent Moran told them that he suspected they were illegal aliens and that he wanted to establish their identity, whether they had been admitted and inspected before entering the United States, and whether they had documents showing they were entitled to stay in the United States. He informed them that they would not make their scheduled flight at 11:10 A.M. and began to make further inquiries of Alaei requesting information as to employment, criminal history, and travel plans. He then proceeded to make a number of phone calls to try to determine the defendants point of entry and whether anyone recalled them coming through the border checkpoints. He also called a communications center to determine if there was any record of a criminal history for either Tehrani or Alaei. Eventually, Agent Moran received information that Alaei had been refused entry into the United States on two prior occasions.

13. During this interim, but prior to 11:10 A.M., Trooper Cucinelli went to the Business Express ticket counter and told an agent there not to put the defendants' luggage on the 11:10 flight to Las Vegas. He did not advise either Tehrani or Alaei of this fact, nor did he seek their approval before doing so. However, it was Trooper's Cucinelli's practice to delay baggage when the owners of that baggage were also delayed for investigative purposes. He did so believing that such individuals would prefer to have their luggage with them when they travelled. Trooper Cucinelli then returned to his office on the second floor.

14. At some point after Trooper Cucinelli returned to the office, Agent Moran noticed a card dropping from Alaei's left hand to the floor, and Alaei's attempt to kick the card with his foot. Agent Moran picked up the card. It was a Concordia University student identification card. The name "Franco Cantini" appeared on its face, and next to it was a photograph of Alaei. Agent Moran then noticed Alaei making motions with his left hand which was now inside his left outergarment pocket. Having immediate concerns for his safety, Agent Moran grabbed Alaei's left hand and yanked it out of the pocket. Alaei responded by shoving Agent Moran. When Alaei's hand was clear of the pocket, Agent Moran saw that it was empty. He then reached inside Alaei's pocket and removed a driver's license which had been torn in half. The name "Franco Cantini" appeared on that driver's license. Agent Moran handed both the student identification card and the torn driver's license to Trooper Cucinelli to inspect. Trooper Cucinelli then inquired of Alaei why he had a different name on these forms of identification. Alaei responded that many people have identification cards such as these so that they could take exams for others and get paid for it.

14. Agent Moran then conducted a pat down search of both Alaei and Tehrani. During this whole time, Tehrani remained defensive. Following the episode with the identification cards and the pat-down searches, Alaei began to exhibit a defensive attitude also. During the time in the office, Alaei and Tehrani conversed in a foreign language which neither Agent Moran nor Trooper Cucinelli recognized or understood. In addition, Tehrani carried a portable phone. He received several phone calls while he was in the office and he conducted his conversations on this phone in a foreign language. However, it was clear to Trooper Cucinelli that both Tehrani and Alaei were visibly upset that they were not going to make their flight.

15. At some point, Tehrani began to act in a more cooperative manner in responding to Agent Moran's questions. He eventually told Agent Moran that he had crossed the border in Vermont and that he had told the inspectors at the border that he was going to Boston for a few days. He also stated that he had entered the country in a Nissan which was now located in the parking lot at the terminal. In addition, he produced his wallet which Agent Moran emptied, inspecting all the documents and papers contained therein. When asked why he did not tell the border inspectors that he was going to Las Vegas, Tehrani replied that he did not want problems, so instead he told them Boston. Alaei also stated that he knew he was going to Las

Vegas when he entered the country but had told the border inspectors Boston.

16. At approximately 11:30 a.m., Agent Moran advised the defendants that they were being arrested for a civil deportation proceeding. He stated that they had violated the terms of their admission by stating that they were going to Boston when their true intent was to go to Las Vegas. He further explained the nature of the civil deportation proceeding and read from a government form, Form I–214A, which advised the defendants of their rights in an administrative deportation proceeding. That warning, as stated on the Form I–214A provides:

> Before we ask you any questions, you must understand your rights.
>
> You have been arrested because it is believed you are an alien not lawfully entitled to be or remain in the United States.
>
> You have the right to be represented by counsel of your choice at no expense to the Government.
>
> Any statement you make may be used against you in a subsequent administrative proceeding.
>
> A decision will be made within 24 hours or less as to whether you sill be continued in custody or released on bond or recognizance.
>
> You are provided with a list of the available free legal services in this district which are qualified and/or recognized by the Immigration and Naturalization Service.

(Exhibit 1).

17. The defendants signed the I–214A form signifying that they understood their rights. The defendants were then told they would be transported to Agent Moran's office in Swanton, Vermont, for paperwork and that they could either challenge the deportation proceedings or sign a document which would return them to Canada immediately.

18. During this period of time, Trooper Cucinelli had requested Corporal Kennedy of the Burlington Police Department to bring the defendants luggage from the Business Express counter up to the State Police office. Cucinelli testified that since the defendants would be transported to Swanton for depor-

tation, he assumed their bags would accompany them. Corporal Kennedy was standing outside the Burlington Police office at the Airport, just down the hall from the State Police office, when Trooper Cucinelli made this request. Kennedy complied, and brought two pieces of luggage up to the State Police office. The luggage arrived in the office just after 11:30 A.M.

19. Agent Moran then picked up a piece of luggage and asked whose it was. Tehrani responded that it was his. Agent Moran then asked if he could search the luggage. Tehrani permitted him to do so. During his search of the articles inside the luggage, Agent Moran discovered twenty counterfeit credit cards. Tehrani then stated in a tone of surprise, "How did they get there?" and further exclaimed that the cards were not his. The name of Franco Cantini appeared on the face of all of the credit cards. Tehrani and Alaei were formally arrested on criminal charges at 3:45 p.m. in Swanton, Vermont, later that day. They were advised of their *Miranda* rights relative to the criminal charges at that time.

### *Discussion*

The defendants argue that the facts surrounding their initial encounters with Agent Moran and Trooper Cucinelli establish that those encounters were seizures which were not based on probable cause nor any reasonable articulable suspicions that criminal activity may have been afoot. They claim that the stop, detention and arrests were thus illegal. Furthermore, the defendants argue that because the statements they made to Agent Moran and Trooper Cucinelli were made while being questioned in a custodial setting without the benefit of being advised of their *Miranda* rights, they should be suppressed. Since the search of their persons and luggage resulted from the illegal detention and questioning, the items found during those searches should be also be suppressed.

The Government, not surprisingly, takes a different approach. It argues that the initial encounters in the parking lot and in the airport waiting area were consensual encounters, not seizures, and thus, the Fourth Amendment is not implicated. The Govern-

ment also maintains that the defendants were sufficiently apprised of their rights when they were administratively arrested for violation of the immigration laws. Thus, any statements made during either the consensual encounter, the investigative detention, or post-administrative arrest are admissible. Moreover, the defendants consented to the search of their luggage; thus, the items seized during that search are also admissible.

The suppression issues are framed as two separate inquiries: (1) whether the seizures and searches were illegal under the Fourth Amendment; and (2) whether the statements made by the defendants were taken during a custodial interrogation in violation of their *Miranda* rights.

## I. *FOURTH AMENDMENT ANALYSIS*

The first question the Court must address is whether the interactions between Agent Moran, Trooper Cucinelli and the defendants were seizures warranting the protections of the Fourth Amendment. The analysis begins with the relevant constitutional and statutory law.

■ The power over immigration and naturalization is vested in Congress under Article 1, section 8 of the Constitution. In turn, Congress has assigned to the Attorney General the duty of apprehending illegal aliens. 8 U.S.C. § 1103(a). The Border Patrol Division of the INS assists in carrying out these duties. 8 C.F.R. § 100.2 (1993); 28 C.F.R. §§ 0.105 (1992). Federal statutory law grants INS officers, such as Border Patrol agents, the power to arrest aliens without a warrant upon a reasonable belief that those aliens are in violation of immigration laws and are likely to escape before a warrant could be obtained. 8 U.S.C. § 1357(a)(2). Section 1357(a)(1) permits an INS officer to interrogate aliens or persons believed to be aliens as to their right to be or to remain in the United States. *Id.* § 1357(a)(1). This provision authorizes questioning to the full extent permissible under the Fourth Amendment. *Zepeda v. United States,* 753 F.2d 719, 725 (9th Cir.1983); *United States v. Bews,* 715 F.Supp. 1206, 1209 (W.D.N.Y. 1989). Accordingly, the Court's inquiry re-

garding Agent Moran's conduct focuses on a Fourth Amendment analysis.

■ The Fourth Amendment prohibits searches or seizures which are unreasonable. The roots of these rights "lie deep in the soil of Anglo–American history, and its terrain has been thoroughly tilled." *United States v. Sugrim,* 732 F.2d 25, 28 (2d Cir.1984). The fruit of Fourth Amendment jurisprudence delineates three categories of encounters between law enforcement officers and individuals: consensual encounters, investigative detentions, and arrests. *United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir.1992). Only detentions and arrests are "seizures" under the Fourth Amendment. *Id.*

■ Consensual encounters are those interactions in which individuals willingly agree to speak with law enforcement persons. "Such contact may be initiated by the police without any objective level of suspicion and does not, without more, amount to a seizure implicating the Fourth Amendment's protections. *Id.* In other words, the Fourth Amendment is intended to curb arbitrary and oppressive governmental interference with privacy interests; it does not proscribe any and all contact between law enforcement officials and individuals. *I.N.S. v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). Investigative detentions are limited stops for investigative purposes which can only be justified by a reasonable articulable suspicion supported by articulable facts that criminal activity may be afoot. *Glover,* 957 F.2d at 1008. A seizure which constitutes an arrest must be based on probable cause. *Id.*

### A. *Consensual Encounters*

■ The point of distinction between a consensual encounter and a seizure, whether an investigative detention or an arrest, is the point at which a reasonable person under all the circumstances would believe he was not free to walk away. *Glover,* 957 F.2d at 1008; *Sugrim,* 732 F.2d at 28. Several factors are relevant for a court's consideration on this issue, including: a threatening presence of several law enforcement persons; a display of weapons; physical contact; tone of voice; prolonged retention of a person's identifica-

tion cards or other personal effects; or a request by the law enforcement officer that the individual accompany the officer to a police room. *Glover,* 957 F.2d at 1008. These are objective factors. The subjective intent of the law enforcement officer is irrelevant. *Id.* at 1010; *Campaneria v. Reid,* 891 F.2d 1014, 1020–21 n. 1 (2d Cir.1989), *cert. denied,* — U.S. ——, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991). Moreover, while a law enforcement officer's request for permission to speak with an individual may give rise to an inference that an encounter is voluntary or consensual, the absence of such a request does not render the interaction involuntary or non-consensual. *United States v. Galindo–Hernandez,* 674 F.Supp. 979, 983 (E.D.N.Y.1987).

 Applying these factors to the case at bar, the facts reveal that both Tehrani and Alaei were approached separately by Agent Moran in different locations. Agent Moran identified himself and asked a few questions about each defendant's citizenship, residence and travel plans. In neither circumstance were Tehrani's or Alaei's movements restricted, nor were they told they could not walk away. Tehrani in fact, continued walking while conversing with Agent Moran. It is true that Tehrani's reactions to Agent Moran's initial inquiries lead one to believe that he was trying to avoid an interaction, i.e., he told Agent Moran he had no right to stop him and would sue him for doing so. However, merely telling an officer that he has no right to stop an individual does not transform a consensual encounter into a seizure. *United States v. Mendenhall,* 446 U.S. 544, 556, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 *reh'g denied,* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). One must look to the totality of the circumstances. *Id.* at 556–57, 100 S.Ct. at 1878.

In this case, both defendants were approached in a non-threatening manner with inquiries regarding their identification. When Tehrani was approached there were two officers, Agent Moran and Trooper Cucinelli. Cucinelli remained a slight distance from Moran and Tehrani while they conversed and walked. Only Agent Moran approached Alaei. At the initial stage of both

encounters no physical touching occurred and no weapons were displayed. Both defendants responded to the questions asked, albeit with hostility in the case of Tehrani.

In its consideration of these facts, the Court is guided by the Second Circuit decision in *Glover. See* 957 F.2d at 1009. Upon review of an analogous set of facts, the *Glover* court found that no seizure had occurred during a period of initial questioning prior to moving to a police office at a bus terminal where the defendant was approached in a public place, and in a non-threatening manner asked questions regarding his travel and identification. *Id.; see also Galindo–Hernandez,* 674 F.Supp. at 983–84 (no seizure prior to administrative arrest where defendants were not restrained and were questioned in a non-threatening way in a public area at an airport). Thus, at least up until the point at which Tehrani and Alaei were each asked to accompany a law enforcement person to the police room in the terminal, the encounters were consensual.

### B. *Investigative Detention*

 Even a brief intrusion to determine or verify identity, if accompanied by restraints on a person's freedom, is a detention and constitutes a seizure under the Fourth Amendment. *United States v. Sugrim,* 732 F.2d 25, 28 (2d Cir.1984). With this principle in mind, it is clear to the Court that at the point at which Tehrani and Alaei were asked to accompany a law enforcement officer to a police room in an area of the airport not frequented by the public, they were seized within the meaning of the Fourth Amendment. At the very latest, they were seized when Agent Moran entered the room with Alaei and told the defendants that he suspected they were illegal aliens and that he wanted to establish their identity and legal presence in the United States before allowing them to proceed. Upon hearing such a statement, a reasonable person would not believe that he was free to leave. However, because such detentions are generally of a limited scope and temporary in nature, they may be permitted on a showing of less than probable cause. If supported by a reasonable articulable suspicion based on articulable facts, the

investigative detention of Tehrani and Alaei is permissible under the Fourth Amendment so long as it was "temporary and last[ed] no longer than [was] necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

Investigative seizures by a border patrol agents occur in various contexts and the standard used to determine a particular seizure's validity varies according to its purpose and the place in which it occurs. *Sugrim*, 732 F.2d at 29. At border stops, or the functional equivalents of border stops,[5] the detention and search of persons seeking admission is considered inherently reasonable and passes constitutional muster even absent probable cause or a warrant. *Id.* "Detention of a traveller at our borders is justified because of a national interest in self protection; so that the person may be required to identify himself and his effects as lawfully entitled to enter." *Id.*

Where a brief detention occurs at places other than at a border or its functional equivalent, e.g., in a roving patrol, a Border Patrol agent must have a reasonable suspicion that an individual is an illegal alien, and that suspicion must be supported by articulable facts. *Id.* at 29–30 (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). There are several kinds of articulable facts which may engender a reasonable suspicion. In *Brignoni–Ponce,* the Supreme Court considered the individual's behavior, appearance, including mode of dress, the officer's experience in detecting illegal aliens and the border's proximity. 422 U.S. at 884–85, 95 S.Ct. at 2581–82. The Second Circuit applied these factors in *Sugrim:*

> The Niagara Frontier Transportation Authority bus terminal where Sugrim was detained is in Buffalo, New York located in close proximity to the Canadian border. The unrefuted testimony establishes that the public bus terminal is a place where there is traffic in illegal aliens. While Sugrim's and his sister's behavior did not excite suspicion, their mode of dress, the extreme difference in their appearances and the absence of any baggage did. Both officers were experienced in the detection and apprehension of illegal aliens and plainly were entitled to draw on that background in making their decision to question Sugrim. Moreover, the suspicious nature of Sugrim's answers to the initial questions gave the agents sufficient justification to continue the detention in the bus terminal interview room.

*Sugrim,* 732 F.2d at 30.

The facts before this Court compel a similar conclusion. Tehrani responded suspiciously to simple, non-threatening questions, and refused to identify himself. His responses were inconsistent with Alaei's responses (he claimed he was travelling alone and that he had entered the country at Burlington). Agent Moran, with several years experience in detecting illegal aliens, had already been alerted to the defendants by their conduct and appearance. He also knew that because of the proximity of the Canadian border, a mere forty miles away, many illegal aliens from the Middle East enter this country from Canada at the Vermont border and then proceed to the Burlington International Airport for travel to further points inside the United States. These facts constitute articulable facts which in turn reasonably support an articulable suspicion that the defendants may be in this country illegally.

Having found the investigative detention permissible, the Court must now consider whether the seizure was limited in scope and duration or whether it ripened into an arrest prior to the time of the administrative arrest. The scope of an investigative detention in the context of roving border patrols has been defined by the Supreme Court: A border patrol agent "may question the [defendants] about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *Brignoni–Ponce,* 422 U.S. at 881–82, 95 S.Ct. at 2580.

---

**5.** A non-stop international flight arriving at an international airport inside the United States is considered a functional equivalent of a border. *United States v. Sugrim,* 732 F.2d at 29.

Up until the time of the administrative arrest, the detention of the defendants in this case was clearly limited to a particular line of questioning—the identification of Tehrani and the legality of the defendants' presence in this country. Further questioning regarding identity followed the discovery of the student identification card seen dropping from Alaei's hand and the driver's license found in his pocket. While the Court finds that the limited pat-down of Alaei and Tehrani was permissible as a frisk for weapons to ensure the officers' safety, Agent Moran's action in reaching into Alaei's pocket was not permissible. Clearly, removing the driver's license was an unreasonable intrusion—a torn piece of paper is hardly a weapon and it was not in plain view. Thus, the driver's license should be suppressed. However, this limited impermissible search did not transform an otherwise valid seizure for investigative purposes into an arrest. In addition, the student identification card was in plain view on the floor of the office. Since questions about the identity of Alaei would naturally follow from the discovery of the student identification card with Alaei's photograph but another person's name, the further questioning by Agent Moran and Trooper Cucinelli as to suspicious circumstances was well within the scope of the investigative detention.

With regard to duration, there is no specific time limit after which a proper investigative detention is automatically transformed into an arrest. Instead, courts should look to the time reasonably needed to pursue the objective of the stop and whether that objective was diligently pursued by an efficient means of investigation. *Glover*, 957 F.2d at 1011; *Gallegos v. Haggerty*, 689 F.Supp. 93, 101 (N.D.N.Y.1988). In this case, Agent Moran immediately made several phone calls to attempt to find out where the defendants entered the United States. He also continued to make limited inquiries of the defendants, and requested documentation, attempting to ascertain whether they were entitled to remain in this country. Initially, he was confronted with one hostile, defensive individual, and later, both men responded in a defensive manner. Under such conditions, a forty minute detention is hardly excessive. *See Glover*, 957 F.2d at 1013 (thirty minute detention where defendant had made misrepresentations was not unreasonable).

The Court concludes then, that the defendants were permissibly detained for further investigation and such investigation did not ripen into an arrest until the defendants were administratively arrested at 11:30 A.M. for violating immigration laws. There is however, the additional matter of the luggage. When the defendants were detained, Trooper Cucinelli asked the airline agent to hold the defendant's bags. The defendants argue that this action was an unreasonable seizure under the Fourth Amendment. The Court disagrees.

When luggage is detained, the validity of the seizure is measured by the same standard as would be used were an individual detained. *Glover*, 957 F.2d at 1011. That is, the seizure must be reasonable. Cucinelli testified that it is his regular practice to hold the luggage of detainees, believing that the detainees would want their luggage to travel with them, not ahead of them. In light of the fact that the defendants were being detained for immigration purposes, it was entirely possible that their travel plans might be altered. The mere detention of luggage so as to accommodate any change in travel plans is inherently reasonable, and I might add, a courteous gesture.[6] Furthermore, since the defendants

---

6. Following the hearing in this matter, defendant Tehrani pointed the Court to a case out of the Northern District of Texas, *United States v. Wright*, 706 F.Supp. 1268 (N.D.Tex.1989), in support of his argument that the consent search was invalidated by an illegal seizure of his luggage. In *Wright*, the court found the seizure of post-arrival unclaimed luggage which had been locked inside a storage facility for safe keeping until claimed, was unreasonable. The officer seizing the luggage acknowledged that he suspected that the luggage contained illegal narcotics, yet he did not attempt to obtain a search warrant, did not use a canine to sniff for drugs, nor did he request a consent from its owner to claim and remove the luggage. Finding that no exigencies existed, and no reasonable suspicion articulated, the court concluded that the seizure, even if temporary, was unreasonable.

were not aware of Trooper Cucinelli's actions, the detention of the luggage could have had no impact on their perceptions regarding the detention of their persons.

## C. *The Administrative Arrest*

■ Administrative arrests must be supported by probable cause to withstand constitutional scrutiny. *United States v. Galindo–Hernandez,* 674 F.Supp. 979, 985 (E.D.N.Y.1987). Without doubt, upon receiving information from the defendants that they had intentionally been untruthful to facilitate their admission into this country, Agent Moran had probable cause to arrest both defendants. Trooper Cucinelli's actions in having the luggage brought to the office was reasonable given that the defendants' departure for Swanton for deportation proceedings was imminent. Neither Agent Moran nor Trooper Cucinelli however, had probable cause to search the luggage. To prevail over a motion to suppress the evidence found in the luggage, the Government must demonstrate by a preponderance of the evidence that the defendants consented to that search. *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968).

## D. *Consent Searches*

■ To find that Tehrani consented to a search of his luggage, the Court must find that the consent was voluntarily given, *i.e.,* it must not result from duress or coercion; it must be "the product of an essentially free and unconstrained choice by its maker." *United States v. Arango–Correa,* 851 F.2d 54, 57 (2d Cir.1988) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). All of the surrounding circumstances should be considered in making such a determination. *Id.*

■ The fact that a defendant is in custody at the time of the consent does not invalidate the consent, even if the period of custody is lengthy. *Id.* Nor is a consent invalid simply because the Government does not advise the defendant of his right to refuse to consent, although proof of knowledge of a right to refuse would be highly relevant to finding a valid consent. *United States v. Mendenhall,* 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). Other factors which are helpful in determining voluntariness include the defendant's age, intelligence and his level of cooperation. But no one factor is dispositive. *Schneckloth,* 412 U.S. at 226–67, 93 S.Ct. at 2047–68.

■ Tehrani concedes that he gave consent to search his luggage, but argues that his consent was not voluntary and that it was tainted by an illegal seizure. Because the Court found the seizures to be valid under the Fourth Amendment, Tehrani's second argument is unavailing. Considering the totality of circumstances in the case at bar, the Court also finds that the Tehrani's consent to search his luggage was voluntarily given. First, Agent Moran and the defendants conversed in English. Both of the defendants were adult males, and no evidence was adduced to suggest anything but that both men communicated with Agent Moran and Trooper Cucinelli without difficulty. By stating that Moran had no right to stop him, Tehrani appeared to be aware of at least some of his rights under United States laws. In addition, at the time of the administrative arrest, Tehrani and Alaei were advised that they had a right to an attorney and that any statements they made could be used against them in an administrative proceeding. They signed a form stating that they understood these rights. Moreover, the custodial setting was not overbearing, the door to the police office was open and only Agent Moran and Trooper Cucinelli were present. Finally, at the point of arrest for violating immigration

---

Unlike *Wright,* this Court found the detention of Tehrani's and Alaei's luggage reasonable. Moreover, the facts in this case are distinguishable. Tehrani and Alaei were not arriving, they were departing, and thus their luggage was not stationary. The initial request to hold the luggage back did not constitute the same level of intrusion as claiming and removing luggage from

a locked storage facility and then removing it to another terminal, as was the case in *Wright.* After the administrative arrest, the luggage was brought to Tehrani and Alaei so that it could be transported with them to Swanton. No evidence was adduced to suggest any other motivation on Trooper Cucinelli's part for retrieving the luggage.

laws, both defendants were interacting with Agent Moran in a cooperative fashion.

In sum, there was no evidence of coercion or duress during the investigative detention or subsequent to the arrest. Since the consent was not tainted by an illegal seizure and was voluntarily given, it was effective to justify the warrantless search of the luggage.

## II. *MIRANDA ANALYSIS*

■ The Fifth Amendment protects an individual's privilege against self-incrimination. U.S. Const. amend. V. To safeguard the exercise of that privilege from the taint of possible coercion during a custodial interrogation, the Supreme Court has held that certain warnings, now commonly known as *Miranda* warnings, are required before questioning a suspect in custody. *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966). Failure to give *Miranda* warnings will result in suppression of any statements made during a custodial interrogation. *Id.* at 479, 86 S.Ct. at 1630. However, a violation of a defendant's *Miranda* rights is not a violation of his Fifth Amendment privilege against self-incrimination, which can only be violated at trial. *See New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984). *Miranda* rights are a procedural protection.

■ *Miranda* warnings are not required during investigative detentions and thus any pre-arrest statements made by either Tehrani or Alaei cannot be suppressed under the theory that a *Miranda* violation occurred. *United States v. Foley*, 735 F.2d 45, 47 (2d Cir.1984), *cert. denied sub nom. Elder v. United States*, 469 U.S. 1161, 105 S.Ct. 915, 83 L.Ed.2d 928 (1985). The requirements of *Miranda* are only applicable when there is 'custodial interrogation'. Interrogation is either express questioning or a functional equivalent reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). The standard for determining whether an interrogation is custodial is whether "a reasonable person in the defendant's position would have understood himself to be subjected to restraints comparable to those associated with a formal arrest." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir.1992).

■ It is clear that at the point of their administrative arrest Tehrani and Alaei were subjected to custodial interrogation. Given the suspected violations of immigration laws, there can be no doubt but that Agent Moran's questions regarding immigration status were a form of interrogation. Furthermore, it is inconceivable that after being told he was under arrest for violating immigration laws and advised of his legal rights in an administrative proceeding, a reasonable person would believe he was free to leave. Unless the warnings given to the defendants at the time of their administrative arrest satisfy the requirements of *Miranda*, any post-arrest statements must be suppressed.

■ The requirements of *Miranda* are met only when the warning reasonably conveys to a suspect his rights. *Duckworth v. Eagan*, 492 U.S. 195, 203, 109 S.Ct. 2875, 2879, 106 L.Ed.2d 166 (1989). Yet there is no "talismanic incantation." *Id.* In sum or substance, a suspect should be advised of the right to remain silent, that anything he said can be used against him, and that he has the right to have an attorney present and that if he can't afford one, an attorney will be appointed for him. *Id.* In this case, the warnings given to Tehrani and Alaei advised them that they were under arrest because they were believed to be illegal aliens; that they had a right to be represented by an attorney and would be provided with a list of free legal services; and that any statement they made could be used against them in an administrative proceeding. The issue before the Court then, is whether the failure to specifically advise the defendants of their right to remain silent, that their statements could be used against them in a court of law, and their right to have an attorney appointed if they could not afford one, renders the warnings given insufficient for purposes of *Miranda*.

■ Certainly, the failure to specifically advise a suspect that he has the right to remain silent is a blatant violation of an individual's *Miranda* rights. The substance

of the Fifth Amendment, and thus, derivatively, the core of a defendant's *Miranda* rights, is the shield it provides over an individual's right to remain silent in the face of governmental pressure to give evidence against oneself. Under the facts of this case, the defendants were told that any statement they made could be used against them in an administrative proceeding, but they were not told that they need not speak at all, nor for that matter, that any statement could be used against them in a court of law. The absence of this additional advice renders the warnings given fatally deficient under *Miranda*. Having reached this conclusion, it is unnecessary to decide today whether the absence of the advice regarding appointed counsel would also constitute a separate violation of *Miranda*. I note in passing that other courts have held it is not. *See e.g., Chambers v. Lockhart,* 872 F.2d 274, 275 (8th Cir.) *cert. denied,* 493 U.S. 938, 110 S.Ct. 335, 107 L.Ed.2d 324 (1989); *United States v. Miguel,* 952 F.2d 285, 287–88 (9th Cir.1991).

■■■ In sum, absent the application of an exception to the exclusionary rule, any statements made between the time of the administrative arrest and the point at which the defendants were properly advised of their *Miranda* rights must be suppressed. However, a *Miranda* violation does not invalidate a consent to search where that consent is found to be voluntarily given, even though given while in custody. *United States v. Moreno,* 897 F.2d 26, 33 (2d Cir.1990). Indeed, a consent to search is not evidence of a testimonial or communicative nature, and therefore, the Fifth Amendment privilege is not implicated. *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir.1974). Thus, the evidence found during the lawful search of the defendants' luggage need not be suppressed under the theory that it was tainted by the *Miranda* violation.

### CONCLUSION

Defendants' motions to suppress are hereby GRANTED IN PART and DENIED IN PART. The torn driver's license found in defendant Alaei's pocket shall be suppressed as a product of an unlawful search under the Fourth Amendment. Any statements made by either defendant on November 13, 1992, after approximately 11:30 A.M., when they were administratively arrested, and approximately 3:45 P.M. that same day, when they were properly advised of their *Miranda* rights, shall be suppressed as they were taken in violation of the defendants' *Miranda* rights. All other physical evidence and statements are admissible.

It is hereby ORDERED that the above entitled matter is scheduled as the number 2 case for trial by jury on Tuesday, July 13, 1993, at 9:30 a.m., with a chamber conference for all counsel at 9:00 a.m.

Counsel shall file any requests for voir dire of the jurors, requests to charge the jury and trial memoranda on or before July 2, 1993.

Counsel are hereby DIRECTED to inform the court of their best estimate of the length of this trial at the time of filing any requests for voir dire of the jurors, requests to charge the jury and trial memoranda.

If there is a change of plea, the court must be notified on or before July 8, 1993, and the plea entered on or before July 12, 1993.

All exhibits are to be marked prior to trial.